# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.   24-MJ-08486-LR
1010 Paulin Avenue, Apt. A, Calexico, California 92231 )
)
)

**FILED**
Jun 04 2024
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY    s/ carolinalopez    DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the   Southern   District of   California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | Distribution of Federally Controlled Substances and Conspiracy Related Thereto |

The application is based on these facts:
See Affidavit of Special Agent Richard Lopez which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Richard F Lopez*
*Applicant's signature*

Richard Lopez, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by   telephone   *(specify reliable electronic means)*.

Date:   06/03/2024

*LR*
*Judge's signature*

City and state:   El Centro, California     Hon. Lupe Rodriguez, Jr., U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT FOR SEARCH WARRANT

I, Richard Lopez, being duly sworn, hereby depose and state:

## INTRODUCTION

1. This affidavit is submitted in support of an application for issuance of a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, for the following location, as more fully described in Attachment A, which is incorporated herein by reference:

> 1010 Paulin Ave., Apt. A, Calexico, California 92231, which is the residential home of Pablo TREJO (the **Target Location**).[1]

2. I seek authority to search the **Target Location** and seize property, more fully described in Attachment B, that constitutes evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and/or property designed for use, intended for use, or used in committing a crime in violation of federal law, specifically, distribution of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846.

3. The facts set forth in this affidavit are based upon my training, personal experience, and information obtained from other law enforcement investigators with whom I have spoken who were involved in this investigation or whose reports I have read and reviewed. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a search warrant, it does not set forth every fact that I, or others, have learned during the course of this investigation. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I am a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations

---

[1] This address is listed as TREJO's residence on his DMV records and with the United States Postal Service. It is also the subscriber address of his telephone, which is registered in his name. Additionally, surveillance of the **Target Location** has identified TREJO coming and going on multiple occasions over a multi-year period.

*Affidavit for Search Warrant*          Page **1** of **10**

(HSI), and have been so employed since November 2018. I am currently assigned to the Assistant Special Agent in Charge (ASAC) Calexico, California Office, Imperial Valley Border Enforcement Security Task Force (IV-BEST). I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

5. I have had on-the-job and formal training in controlled substance investigations. Prior to my employment with HSI, I was employed as a police officer with the El Centro Police Department in El Centro, California between 2008 and 2018. Between April 2014 and October 2014, I was a Task Force Officer (TFO) for IV-BEST, during which I participated in, among others, Title III wire-intercept investigations involving the importation and distribution of controlled substances. During the narcotics investigations I have participated in while at my current position and in the past, I have used a variety of investigative techniques and resources, such as physical and electronic surveillance, pen register and trap and trace devices, telephone toll analysis, informants and cooperating sources, undercover operations, search warrants, Title-III wiretaps, subpoenas, and analysis of telephone records. Additionally, I have had numerous discussions with senior law enforcement officers and investigators, within my agency and others, concerning controlled substances crimes and criminal activity.

6. With respect to my formal training, I attended a six-month, full-time Police Academy at the Ben Clark Public Safety Training Center in Riverside, California and graduated in April 2009. During the academy, I completed 12 hours of training specialized in crimes involving illegal substances. I also have received specialized training in narcotics investigations from federal and state law enforcement agencies, such as the DEA and HSI. For example, I attended the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I graduated in June 2019.

*Affidavit for Search Warrant*                Page 2 of 10

7. Through my training, as well as the experiences outlined above, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I also am familiar with the methods employed by narcotics organizations to thwart detection by law enforcement, including but not limited to the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, and coded communications. Additionally, I am familiar with how drug traffickers communicate and operate. I am aware that drug traffickers frequently use coded language to obscure conversations about their unlawful activity because they believe coded language makes it more difficult to identify their conduct. Further, as a result of my training and experience, I have obtained knowledge regarding the ordinary meaning of controlled substance slang and jargon. As such, in this affidavit, I have included, where appropriate, my interpretation of quoted and/or coded language in brackets. Those interpretations are based upon my training and experience, conversations I have had with other law enforcement investigators familiar with this investigation, and my personal participation in this investigation.

8. Further, based on my training and experience, I know that:

    a. Individuals involved in drug trafficking often utilize their residences and vehicles to store controlled substances; weigh, cut, test, and package the illegal narcotics; store narcotics proceeds; and/or store information relating to their drug trafficking business.

    b. Individuals involved in drug trafficking often have contraband on hand, secreted at their residences and vehicles, in order to maintain supply for their customers. It takes time to develop clientele and keeping them requires a steady supply on hand. For the same reason, individuals involved in drug trafficking often maintain at their residences and vehicles paraphernalia for packaging, weighing, cutting, testing, distributing, and manufacturing federally controlled substances. They also have "fruits" of their illegal sales on hand, including United States currency and other valuables.

c. Individuals involved in drug trafficking often maintain records of their drug and proceeds transactions at their residences and vehicles for months or years at a time. It is common, for example, for drug traffickers to keep pay/owe sheets or other records of drugs sold and proceeds of unlawful activity owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time, even after the debts are collected. I have found in my training and experience that because such records are invaluable to drug traffickers, they are rarely discarded. Finally, it has also been my experience that such pay/owe sheets or other documents maintained by drug traffickers at their residences and vehicles frequently include the names, identities, and telephone numbers of suppliers, customers, and other co-conspirators (such as couriers or stash house operators). Individuals involved in drug trafficking must often rely on others to obtain their controlled substances and to help them market the drugs. Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at their residences and vehicles.

d. Individuals involved in drug trafficking commonly earn income in the form of cash. Drug traffickers frequently attempt to hide this cash at their residences and vehicles. Such funds are often used for every-day expenditures and to maintain and finance their ongoing drug trafficking businesses. Individuals involved in narcotics trafficking also commonly try to legitimize their cash profits. In order to do this, traffickers frequently attempt to secrete, transfer, and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences and vehicles of individuals involved in narcotics trafficking.

e. Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition at their residences and vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of drug trafficking. Furthermore, I am aware

of instances in which drug traffickers have maintained such items at their residences and vehicles in order to protect themselves and guard their drugs and profits, as well as for enforcement purposes during their narcotics dealings.

   f. Residences used by individuals involved in drug trafficking usually contain documents showing possession, dominion, and/or control of the location, including but not limited to utility statements, telephone statements, financial statements, insurance statements, and rental or other agreements.

   g. Individuals involved in drug trafficking frequently communicate with coconspirators by means of cellular telephones and other electronic devices, such as computers and tablets, and usually maintain these items at their residences and vehicles. Drug traffickers often use cellular calls, text messages, e-mail, social networking websites, and the internet to further their criminal activity, by, among other things, communicating with their coconspirators, meaning others who are involved with and/or or provide assistance with the illegal purchase, possession or manufacture or distribution of controlled substances, and posting information about their exploits. Indeed, I have participated in investigations where computers, tablets, internet-enabled cellular "smartphones," and conventional cellular telephones were seized and searched pursuant to court authorized search warrants that contained digital photographs of bulk cash and pictures of the target with drug associates, as well as messages and documents referencing drug trafficking and drug transactions. I further am aware that electronic devices tend to generate evidence that is stored on the devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

## PROBABLE CAUSE

9. In December 2019, HSI investigators initiated an investigation into the drug trafficking and money laundering activities of a source of supply, and other members of his drug-trafficking organization, based in Mexicali, Baja California, Mexico, and the United States. That investigation, which included multiple rounds of wiretap intercepts,

alerted investigators to a separate Mexicali-based drug-trafficking organization (DTO) with a distribution network located in Imperial Valley, California.

10. Investigators learned that this separate DTO is led by Jorge TORRES, aka "Gordo," a Mexicali, Mexico-based source of supply responsible for facilitating the smuggling of multi-kilogram quantities of, among others, methamphetamine from Mexico into the United States through the Calexico, California Ports of Entry. Investigators learned that, once smuggled through the border, sub-distributors, including TREJO, stashed the narcotics at various residences in Imperial County, California, before they were distributed to other locations in the United States, including in the Imperial Valley.

11. An investigation targeting the TORRES DTO was initiated and involved two rounds of wire-intercept orders. As a result of those intercepts and intercepts associated with the initial investigation, investigators learned that TREJO was a methamphetamine and fentanyl sub-distributor who supplied others, including co-defendants Francisco Javier Ramirez-Garcia, aka "PITUFO," and Javier JACQUEZ, with distribution amounts of methamphetamine.

12. A total of 122.65 kilograms of methamphetamine were seized in connection with the investigation, which resulted in the indictment of 15 individuals, on or about January 11, 2024. That included TREJO who was charged by the grand jury with conspiracy to distribute fentanyl and methamphetamine in violation of Title 21, United States Code, Sections 841 and 846; conspiracy to possess with intent to distribute methamphetamine in violation of Title 21, United States Code, Sections 841 and 846; possession with intent to distribute methamphetamine in violation of Title 21, United States Code, Sections 841 and 846; and money laundering conspiracy in violation of Title 18, United States Code, Section 1956. An arrest warrant was issued for TREJO the same day. TREJO remains a fugitive but is believed to reside at the **Target Location**, and investigators believe his arrest is imminent. This search warrant for the **Target Location** follows.

**A.    TREJO Distributed Methamphetamine from the Target Location in April 2023[2]**

i.    April 17, 2023

13.    On or about April 17, 2023, TREJO[3] had a telephone call with co-defendant PITUFO. During the call, PITUFO asked, "Uh . . . is there any food [methamphetamine]?" TREJO's response was unintelligible. PITUFO then stated, "Okay. I'll wait, then." TREJO responded, "I'll be back like at noon, man."

14.    Based on training and experience, investigators believed that PITUFO was requesting methamphetamine from TREJO. Investigators are aware that drug traffickers often utilize slang or coded terms because they believe it provides them with plausible deniability. Here, investigators believed that PITUFO was using "food" to refer to methamphetamine.

15.    A little after noon, TREJO and PITUFO had another telephone call. During the call, PITUFO asked, "Are you at home already, Godfather [nickname for TREJO]?" TREJO affirmed, and PITUFO stated, "Yes, going over right now. G-g-going on the bike." Based on training and experience, investigators believed that a methamphetamine transaction was imminent.

16.    As such, investigators initiated surveillance at the **Target Residence**. During surveillance, investigators observed PITUFO arrive at the **Target Residence** on a bike and meet with TREJO. He left shortly thereafter. Investigators maintained surveillance of PITUFO and coordinated with the Calexico Police Department to conduct a pedestrian check. Calexico Police Department seized 28.59 grams (actual) of methamphetamine from PITUFO who stated that he had "ice" on him and provided investigators with a baggie of methamphetamine from his pocket.

---

[2]    The calls outlined in this subsection were obtained pursuant to wire-intercept order(s).

[3]    TREJO identified this telephone number as his to law enforcement in 2022. Additionally, investigators familiar with his voice also recognized his voice as the user of the telephone number during intercepts.

### ii. April 19, 2023

17. On or about April 19, 2023, TREJO had a telephone call with co-defendant JACQUEZ. During the call, JACQUEZ stated, " . . . I was seeing if I go over there or if you can came, dude. Or . . . I am going over there." TREJO responded, "Let me know if you are coming[,]" and JACQUEZ stated, "Okay. Okay. All right then." TREJO also asked, "How many? Two [ounces of methamphetamine]?" and JACQUEZ answered, "One and half [ounces of methamphetamine]." TREJO acknowledged.

18. Based on training and experience, investigators believed that TREJO and JACQUEZ were discussing the distribution of one-and-a-half to two ounces of methamphetamine from TREJO to JACQUEZ.

19. Indeed, less than two hours later, JACQUEZ and TREJO had another telephone call. During the call, JACQUEZ stated, "I'm busy. Can you come?" TREJO responded, "Yeah. Where are you?" and JACQUEZ answered, "Right there, at the same place." TREJO stated, "I'm going now." Based on training and experience, investigators believed that a methamphetamine transaction between TREJO and JACQUEZ was imminent.

20. As such, investigators initiated surveillance at the **Target Residence**. During surveillance, investigators observed TREJO leave the **Target Residence** and travel directly to the parking lot of the Falcon Smoke Shop in Calexico, California. Investigators observed JACQUEZ approach TREJO in the parking lot and observed a brief meeting, which they believed to be a hand-to-hand drug transaction. As such, investigators maintained surveillance of JACQUEZ and coordinated with the Calexico Police Department to conduct a pedestrian check. Officers subsequently seized 51.91 grams (actual) of methamphetamine from him.



21. Based on training and experience, investigators believe that TREJO was stashing the methamphetamine that he distributed to JACQUEZ at the **Target Residence**. This belief is bolstered by the initial conversation between the parties in which TREJO stated, "Let me know if you are coming[,]" which investigators believe was a reference to the **Target Location**; the fact that TREJO went directly from the **Target Residence** to the Falcon Smoke Shop where he distributed the methamphetamine; and, TREJO's distribution of methamphetamine to PITUFO from the **Target Residence** two days prior.

**C.   TREJO Continues to Use the Target Location for Drug-Trafficking Activity**

22. On or about May 29, 2024, investigators established surveillance in the vicinity of the **Target Location**. During surveillance, at approximately 4:06 p.m., investigators observed TREJO arrive at the **Target Location** in his blue Chevrolet Malibu that is registered to him. A few minutes later, at approximately 4:24 p.m., a male arrived at the **Target Location** on a bicycle. Approximately 5 minutes later, TREJO and the male were seen exiting the **Target Location**. Based on training and experience, including the brief duration of the meeting, investigators believed that they had observed a hand-to-hand drug transaction.

23. As such, investigators then maintained physical surveillance of the male until the Calexico Police Department conducted a pedestrian check of him. During the contact, the Calexico Police Department seized approximately 28.6 grams of a substance that has field-tested as positive for methamphetamine and 5.8 grams of suspected fentanyl pills.

*Affidavit for Search Warrant*          Page 9 of 10

24. Based on the information outlined above, investigators believe that TREJO uses the **Target Location** for the purposes of conducting drug distribution activities and that a search of **Target Location** is likely to identify evidence of such activities in the form of the evidence identified in paragraph 8.

## CONCLUSION

25. Based on all of the above, my experience and training, a review of documents and other relevant information I believe to be reliable, and discussions with other law enforcement officers, it is my opinion that the items listed in Attachment B are evidence of; contraband, fruits of; or property designed for use, intended for use, or used in committing a crime in violation of federal law, specifically, distribution of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846. It is also my opinion that there is probable cause to believe that the items set forth in Attachment B are present at the **Target Location**, as more fully described in Attachment A.

26. As such, I request the issuance of a search warrant authorizing a search of the **Target Location**, and the seizure of items described with particularity in Attachment B.

I declare under penalty and perjury the foregoing is true and correct to the best of my knowledge and belief.

*Richard F Lopez*
Special Agent Richard Lopez
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 on June 3, 2024.

_____  4:59 p.m.
The Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The **Target Location** is located at 1010 Paulin Avenue, Apt. A, Calexico, California 92231. It is located on the east side of the 1000 block of Paulin Avenue. Unit A is part of a multi-family apartment complex, which is tan in color and made of cinderblock. The bottom portion is stucco, which is a darker tan color, and has brown trim. It has the numbers "1010" affixed in a vertical position on the west wall of the building in the upper north area of the wall. The **Target Location** has two metal screen doors, one facing north (which is the main entrance) and one facing south.





Investigators request authority to search all the premises and all parts therein, including all rooms, attics, basements, cellars, crawl spaces, safes, mail receptacles, storage areas, containers, immediately surrounding grounds, garages, sheds, and shacks assigned to or part of the **Target Location,** which could reasonably conceal the property described in Attachment B, and all vehicles parked at or near the **Target Location** which can be identified as being under control by TREJO by keys, documents, statements, and/or DMV records, including but not limited to the blue

Chevrolet Malibu described in the affidavit. For all vehicles searched, authority is requested to search all the premises and all parts therein, including internal storage such as gloves boxes and center consoles, under seats and mats, hidden storage compartments, and any external storage space, which could reasonably conceal the property described in Attachment B.

# ATTACHMENT B
# ITEMS TO BE SEIZED AND SEARCHED

The items to be seized at the **Target Location** described in Attachment A are evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and/or property designed for use, intended for use, or used in committing a crime in violation of federal law, specifically, distribution of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846. The evidence to be seized is limited to the following:

a. Federally controlled substances illegally possessed;

b. Paraphernalia for packaging, using, weighing, cutting, testing, distributing, and/or manufacturing federally controlled substance(s);

c. Weapons illegally possessed, firearms, firearms accessories, ammunition, and/or documents relating to the purchase and/or possession of such items;

d. Bulk currency, including but not limited to United States currency, and property designed to store such currency, such as safes and lock boxes;

e. Ledgers and other documents containing information regarding or relating to drug trafficking, including but not limited to pay/owe sheets; documents reflecting telephone numbers and addresses of couriers, stash house operators, supply sources, customers, and/or other co-conspirators involved in drug trafficking; and documents reflecting the placing of assets in others' names;

f. Documents showing TREJO's possession, dominion, and/or control of the **Target Location** and vehicles, including but not limited to utility statements, telephone statements, financial statements, registration documents, rental or other agreements, vehicle insurance documents, and vehicle bill of sale documents; and,

g. Computers, tablets, and/or cellular telephones (seizure only is requested at this time);

which are evidence of; contraband of, fruits of, or other items illegally possessed; and/or property designed for use, intended for use, or used in committing violations of Title 21, United States Code, Sections 841 and 846.